By the Court.
Sandford, J.
The plaintiff contends that the maker of a premium note given to a mutual insurance company, for the security of dealers, under the twelfth section of the act applicable to this class of companies, can discharge his obligation only by receiving policies issued to himself, and covering his own interest as an insurer; and that he cannot discharge it by receiving policies made to others, or covering the interest of others, whom he has influenced to insure with the company.
Unless this proposition is correct, the action cannot be maintained ; because it is shown that the premiums earned and paid, which were applied in reduction of the defendant’s note, were *232 all earned on policies issued to him, or which were issued through his influence to other parties.
We hare considered the subject, and see no good reason for differing from the referees in their conclusion. The object of the novel security provided by this twelfth section, as we have often held, was to provide a substitute for capital stock by inducing capitalists and business men to lend their credit to the mutual companies. The inducements held out to the makers of the notes were, first, a per centage for the use of their credit; and, secondly, a gradual extinction of the liability, by payment of a corresponding amount in premiums, on policies to be issued by the company receiving the notes. As was well illustrated by the late chief justice, in Hone v. Allen, (1 Sandf. 171, note,), these companies could not hope for public patronage on the security of the premiums on the half million of dollars of insurance with which most of them were to commence operations. A large amount of subscription notes, under the twelfth section, was indispensable to a favorable beginning. In the case cited, the amount was $250,000; being thirty times more than the amount of premiums written, upon which the company there in question were entitled to organize.
In order to launch this company, it was necessary therefore, first, for its friends and patrons to take actual insurances in the outset to half a million of. dollars; and then to give or obtain subscription notes for premiums in advance, under the twelfth section, to furnish the real foundation for its business. It is very apparent that these notes would, in general, be given, not for premiums expected to be presently written or insurances likely to be- soon required by such friends and patrons of the company, for their personal benefit. It would be a great inducement for those friends, as well as all others, to give such notes, and so far as we can perceive, a great advantage to the Company, in enlarging its sphere of business,-if, on giving large subscription notes, the makers could reduce their liability by bringing persons to insure with the company, and to pay pre- • miums applicable to the subscribers’ notes. That such has been the universal, and heretofore unquestioned, practice, in these *233 mutual companies from their origin, we have abundant reason to know, from very numerous judicial investigations in this court during the last three or four years.
It may, however, be justly observed, that usage does not make the law, and to return to the question: Such being the circumstances in respect of which this twelfth section was enacted, is there any thing in it, or any other portion of the charter of the company, which requires us to adopt a different rule ?
The notes are to be given by “ persons intending to receive its policies.” Those who receive its policies for their friends, whom they have induced to come and take insurances, and who otherwise never would have come, do receive its policies. But it is said the act means that the policies to be received must be issued to the maker of the note himself, or for the insurance of some interest of his own. We think this is altogether too narrow a construction of the provision. This was a marine as well as fire insurance company, and the case discloses that a considerable part of its business was .marine insurance. A large proportion of marine insurances are made in the name of persons who have no interest at all in the subject matter. If the defendant had taken the whole amount of this note in premiums on policies, in his own name, on ships, cargoes, and freight, for account of whom it might concern, in which he had no interest, and no charge beyond a correspondent’s request to make insurance ; would that be a valid discharge of his premium note ? It would, within the letter of the twelfth section, but clearly not within its spirit, if the plaintiff’s argument be a sound one. Yet we cannot doubt that such insurances were intended to be included in the expression, “persons intending to receive its policies.” Nor do we discover why insurances, actually obtained for the company, and thus received from it by the plaintiff, for and in the name of his friends and correspondents, are not equally within the intention of the statute. There is, we repeat, nothing expressed to the contrary. It accords with the object and purposes of the provision, and conflicts with no rule of construction or of policy, so far as we can discover.
The plaintiff argued that this construction would overthrow *234 all the advantages sought to be secured to the public, in the annual report of the affairs of the company required by the fifth section of its charter; one portion of which was to be a statement of the amount of premium notes and cash on hand, with other assets of the company.
We do not perceive the consequence claimed upon this requirement. The whole publication exacted by the fifth section is totally defective in giving any adequate view of the affairs of the company. And, as one example, the “ premium notes” to be stated in the clause cited, certainly embrace premium notes given on policies written, whether fully earned, or only commencing to run; as well as the subscription premium notes under the twelfth section. Thus, the public reading the report would learn nothing as to the amount of real available notes held by the company. Then, in respect of subscription notes: If on the 1st of January, 1847, when an annual statement was made, the defendant’s note had stood at $5000, and prior to that date he had received policies for himself and his friends, the premiums on which were $2000; the statement, if truly made up; could not present any delusive account of the company’s affairs in respect of the note. Suppose half the premiums were on fire policies. Those are payable in advance, and would have been charged to the defendant at their respective dates. The sum total would have been deducted as of January 1st, 1847, from the amount of the note, which would then have appeared at $4000 in the report. Suppose the other $1000 to have been for marine insurances, one half of which had been earned, and the residue were still outstanding. The earned premiums would of course have gone into the account, and.been deducted with the fire premiums, and the note in the statement would thus appear at $3500. The outstanding marine premiums would not have appeared at all in the annual statement, as the only note held for them would have been the subscription note. When paid, subsequent to the 1st of January, they would extinguish so much of that note ; and in this particular would have no different effect on the verity of the statement, than would a like payment of the ordinary premium notes given *235 on taking out marine policies, which, notes had appeared as assets in the statement, the premiums having been actually earned. If we suppose that fire premiums were chargeable, and marine premiums were earned, on the 1st of- January, 1847, which were to apply on the defendant’s subscription note, but which had not, in fact, been then paid; two suggestions may be made: First, The effect on the annual statement would be precisely the same, whether such insurances had been made in the defendant’s name or in the name of his friends; Second, The debts due to the company for premiums earned, and not paid, are not set forth in the annual statement at all. Therefore there would be no deception in stating the defendant’s subscription note at $5000, although it was liable at any moment to be reduced $1500, by his paying upon it that sum in respect of such earned premiums. Whether the $1500 were entered on the statement as so much due on a premium note, or as so much due for premiums earned, it would show no more and no less; and as it could only appear, in complying with the statute, under the former head, it clearly could not affect the public, if it more appropriately belonged under the latter. By whichever name it was designated, it would represent an asset of $1500, payable to the company. If paid on the 31st of December, the statement would have shown $1500 more under the head of cash on hand, and $1500 less under the head of premium notes.
The plaintiff made two other points, which we deem disposed of by our conclusion on the principal question. First, he claims that the giving up the defendant’s successive notes was in violation of the section of the revised statutes prohibiting -transfers of the effects of monied corporations, exceeding the value of one thousand dollars, unless authorized by a previous resolution of their boards of directors. Secondly, that the same acts were a payment to a stockholder of a part of the capital stock, in violation of another section of the same chapter of the revised statutes. In answer to the latter point, it will suffice to say, that although these subscription notes are a substitute for capital, they are not capital stock. This class of insurance companies has no capital stock. ■ •
*236 It is, however, a perfect answer to both points, that there was no transfer of effects, or payment of stock, to the defendant. It was simply the discharge of his obligation to the company, on receiving payment from him, in a mode warranted by its terms.
The motion to set aside the report of the referees must be denied.